1
2
3
4
5
6
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GE LOR PAO,

11            Petitioner,              2:  10 - cv - 758 - MCE TJB

12      vs.

13   G.D. LEWIS, Warden,

14            Respondent.         ORDER, FINDINGS AND

15                               RECOMMENDATIONS

16   _____/

17                          I.  INTRODUCTION

18        Petitioner is a state prisoner proceeding with a *pro se* federal habeas petition pursuant to

19   28 U.S.C. § 2254.  Petitioner was found guilty after a jury trial of first-degree murder.  The jury

20   also found true a gang enhancement and that Petitioner personally discharged a firearm causing

21   great bodily injury or death.  Petitioner received a sentence of fifty years to life imprisonment.

22   Petitioner raises the following claims in his federal habeas petition:  (1) trial court error for

23   failing to give a voluntary manslaughter instruction as well as ineffective assistance of counsel

24   for failing to revisit the issue of the voluntary manslaughter instruction with the trial court

25   ("Claim I"); (2) prosecutorial misconduct ("Claim II"); (3) trial court error when it admitted

26   evidence that a witness had previously seen Petitioner in possession of a gun ("Claim III"); and

(4) Petitioner's additional sentence of twenty-five years to life imprisonment for using a firearm which caused death constituted double jeopardy ("Claim IV").  For the following reasons, the habeas petition should be denied.

## II.  FACTUAL BACKGROUND[1]

The defendants [Petitioner and Chongt Yang] are members of the Yang Boyz or YBX gang, a subset of the Hmong Nation Society or HNS gang.  The victim, Pra Sert Yang (Pra) was a member of the Menace Boys Crew or MBC gang.  MBC and HNS are rival gangs.

On February 20, 2005, Pra was driving his red Honda in Sacramento, and the defendants, along with Bou Vang (Pao's girlfriend) and Cheng Xiong Vang, were riding in a gold Toyota, also in Sacramento.  Eventually, both cars were headed eastbound on Florin Road, near Stockton Boulevard, at the same time.
The red Honda stopped on Florin Road, at the intersection with Stockton Boulevard, in the left turn lane.  The gold Toyota pulled to the right lane.

The defendants existed the gold Toyota in traffic – Pao from the front passenger seat and Yang from the rear passenger seat.  Each had a gun.

The defendants approached the red Honda.  Each of the defendants shot multiple times at Pra, who was inside the Honda.  He was hit six times and killed.

After the defendants returned to the gold Toyota, it went through the parking lot of a business on the corner and then onto southbound Stockton Boulevard.

Yang, 2009 WL 3069579, at *1.

## III.  PROCEDURAL HISTORY

After his conviction and sentence, Petitioner appealed to the California Court of Appeal raising the same issues that he raises in this federal habeas petition.  On September 28, 2009, the California Court of Appeal affirmed the judgment against Petitioner in a written decision.  See Yang, 2009 WL 3069579.

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District's decision dated September 28, 2009, People v. Yang, Nos. C056356, C056754, 2009 WL 3069579 (Cal. Ct. App. Sept. 28, 2009) which was attached to Respondent's answer.

2

1    Petitioner then filed a petition for review to the California Supreme Court.  That court

2    summarily denied the petition for review on January 13, 2010.

3    Petitioner filed a federal habeas petition in March 2010.  He filed an amended federal

4    habeas petition in July 2010.  Respondent answered the petition in November 2010.  Petitioner

5    filed a traverse in March 2011.

6                    IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

7    An application for writ of habeas corpus by a person in custody under judgment of a state

8    court can only be granted for violations of the Constitution or laws of the United States.  See 28

9    U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

10   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

11   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

12   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

13   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

14   decided on the merits in the state court proceedings unless the state court's adjudication of the

15   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

16   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

17   resulted in a decision that was based on an unreasonable determination of the facts in light of the

18   evidence presented in state court.  See 28 U.S.C. 2254(d).

19   As a threshold matter, a court must "first decide what constitutes 'clearly established

20   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

21   538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

22   under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

23   at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

24   application clause, a federal habeas court making the unreasonable application inquiry should ask

25   whether the state court's application of clearly established federal law was "objectively

26   unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

1   not issue the writ simply because the court concludes in its independent judgment that the

2   relevant state court decision applied clearly established federal law erroneously or incorrectly.

3   Rather, that application must also be unreasonable." Id. at 411.  Although only Supreme Court

4   law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

5   determining whether a state court decision is an objectively unreasonable application of clearly

6   established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

7   the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

8   applied, we may look for guidance to circuit precedents.").  In this case, the last reasoned court

9   decision was from the California Court of Appeal on direct appeal.

10                          V.  ANALYSIS OF PETITIONER'S CLAIMS

11         A.  Claim I

12         In Claim I, Petitioner argues that the trial court should have instructed the jury on

13   voluntary manslaughter and that counsel was ineffective for failing to have the trial court revisit

14   the issue.  The California Court of Appeal analyzed these issues as follows:

15              Pao contends that the trial court erred by not instructing the jury
                concerning voluntary manslaughter as a lesser included offense of
16              murder.  He claims there was sufficient evidence of provocation to
                require this instruction.  We disagree.  Evidence of provocation, if
17              any, was insubstantial and did not warrant a voluntary
                manslaughter instruction.
18
                When a defendant is charged with murder, the trial court's duty to
19              instruct sua sponte on the lesser included offense of voluntary
                manslaughter arises whenever there is substantial evidence that a
20              jury could reasonably conclude that the defendant killed the victim
                in a sudden quarrel or heat of passion (People v. Breverman (1998)
21              19 Cal.4th 142, 153-164 (Breverman); People v. Barton (1995) 12
                Cal.4th 186, 200-201 (Barton).)  "Heat of passion arises when 'at
22              the time of the killing, the reason of the accused was obscured or
                disturbed by passion to such an extent as would cause the
23              ordinarily reasonable person of average disposition to act rashly
                and without deliberation and reflection, and from such passion
24              rather than from judgment.' [Citations.]" (Barton, supra, at p.
                201.)  "Moreover, the passion aroused need not be anger or rage,
25              but can be any "'[v]iolent, intense, other than revenge [citation].
                'However, if sufficient time has elapsed between the provocation
26              and the fatal blow for passion to subside and reason to return, the

                                                    4

killing is not voluntary manslaughter. . . .' [Citation.]" (<u>Breverman</u>, <u>supra</u>, at p. 163.)

"[T]he trial court need not instruct on a lesser included offense whenever *any* evidence, no matter how weak, is presented to support an instruction, but only when the evidence is substantial enough to merit consideration by the jury." (<u>Barton</u>, <u>supra</u>, 12 Cal.4th at p. 195, fn. 4, original emphasis.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive" (<u>Id.</u> at p. 201, fn. 8) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (<u>Breverman</u>, <u>supra</u>, at p. 162.) "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." [FN 3] (<u>People v. Cole</u> (2004) 33 Cal.4th 1158, 1215.)

[FN 3]  The Attorney General contends that, even though Pao requested an instruction on voluntary manslaughter, Pao forfeited the contention for appellate purposes because he did not obtain a ruling on the request.  We disagree that the contention was forfeited.  The trial court had a duty to instruct sua sponte on "all theories of a lesser included offense which find substantial support in the evidence." (<u>Breverman</u>, <u>supra</u>, 19 Cal.4th at p. 162.)  In light of this conclusion that the issue is not forfeited, we need not consider Pao's contention that his trial counsel was ineffective for failing to obtain a ruling on the request for a voluntary manslaughter instruction.

Pao bases his argument that the trial court should have given a voluntary manslaughter instruction on evidence of two incidents:  (1) Pra's confrontation with Pao's cousin, Lue Yang and (2) shots fired at Pao's residence from an apartment that Pra later occupied.

The first incident involved Lue Yang, who is Pao's cousin.  Lue lived with Pao's family in Marysville when Lue and Pao were children.  They also lived together for some period of time after they each moved to Sacramento.

In June 2004, eight months before Pra's killing, Lue visited Pao's home and then left to meet his brothers to go fishing.  Pra, in the red Honda, pulled up in back of Lue, while a truck pulled up along Lue's passenger side, thus cornering Lue.  A Hmong person in the truck pointed a gun at Lue.  After this confrontation, Lue drove home and picked up a friend, Her Kue, who was armed.  They again encountered Pra in the red Honda.  Someone in the Honda pointed something at Lue and Her, so Her rolled down the window and shot at the red Honda.

Lue told Pao about the June 2004 incident with Pra.

The second incident involved the firing of shots at Pao's residence from an apartment nearby.  On two successive nights in August 2004, six months before Pra's killing, shots were fired at the house in which Pao lived with his family.  The shots were fired from the direction of an apartment in which Pra lived at the time he was murdered.  Citing this evidence, Pao states:  "It is thus reasonable to infer that when [Pao] encountered Pra on February 20th in Sacramento, he had learned that Pra, the same person who had twice attempted to assault [Pao's] cousin after the cousin had stopped at [Pao's], lived in the apartment in front of which shots had been fired at the home of [Pao] and his family.  At the same time, it cannot be said with any certainty that [Pao] knew that Pra had in fact moved into that apartment only after August 2004."

A conviction of voluntary manslaughter based on heat of passion requires proof beyond a reasonable doubt of an objective test of "sufficient provocation," that is "'provocation' sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment" "'(Breverman, supra, 19 Cal.4th at p. 163.) and a subjective test of provocation, that is, whether the defendant's reason was *actually* overcome by overwhelming passion at the time of the homicide.  (People v. Lujan (2001) 92 Cal.App.4th 1389, 1411.)

The record here fails to demonstrate that Pao acted with objective provocation – that is, whether the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  Viewing the incidents cited by Pao individually or collectively, any provocation was very stale and attenuated, and thus insufficient to warrant an instruction on voluntary manslaughter.

Pra's confrontation with Lue took place eight months before Pao killed Pra.  In addition to the passage of time, there is no evidence that Pra or his cohorts fired at Lue.  An ordinary person of average disposition would not have been provoked to kill Pra because there had been a confrontation of this type then so remote, a confrontation that did not involve Pao.

As to the second incident, the evidence concerning Pra later living in the apartment from which shots had been fired at Pao's home is speculative.  There is no evidence that Pao knew where Pra lived or that he associated Pra with the apartment in question.  Without such knowledge, there would be no possibility of provocation.

Pao argues, however, that, even though the evidence concerning provocation was remote in time, seeing Pra "re-ignited" Pao's "smoldering passion" and "he became so inflamed with anger and fear that he jumped out of the Camry and shot Pra while in the heat of passion."  For this proposition, Pao cites People v. Bridgehouse

6

(1956) 47 Cal.2d 406 (overruled on other grounds in People v. Blakeley, (2000) 23 Cal.4th 82, 89).  In that case, the defendant shot and killed his wife's paramour.  The wife had told the defendant that she was having an affair and refused to end it.  When the defendant encountered the paramour unexpectedly, he was overcome by emotion and shot and killed the paramour.  The California Supreme Court, reviewing the defendant's conviction for second degree murder, concluded that the evidence was insufficient to sustain a second degree murder conviction because of the undisputed evidence of the defendant's emotional and mental state at the time of the shooting.  At most, the defendant was guilty of voluntary manslaughter.  (People v. Bridgehouse, supra, at pp. 413-414.)

Pao asserts:  "There was substantial evidence to support the inferences that [Pao's] being stopped at this same intersection at the time was, like the Bridgehouse defendant's walking into his mother-in-law's home and seeing his wife's paramour, an unexpected encounter."  He additionally asserts that his actions – getting out of his car in traffic and shooting Pra in broad daylight – support a conclusion that he acted in the heat of passion.

The assertion that this case is similar to Bridgehouse is without merit.  In that case, there was ample, undisputed evidence that the defendant was distraught and visibly shaken by his unexpected encounter with his wife's paramour, whom defendant's wife refused to leave.  Here, there is no such evidence that Pao's prior experiences (or those of Pao's family) with Pra affected Pao in such a way as to negate malice.  Furthermore, the fact that the crime was shockingly brazen does not show provocation at all, much less provocation sufficient to justify a voluntary manslaughter instruction.

The evidence was insufficient to support a conclusion that Pao's killing of Pra was a result of provocation.  Therefore, the trial court correctly did not instruct on voluntary manslaughter.

Yang, 2009 WL 2069579, at * 10-13.

Claims based on instructional error under state law are not cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  However, Petitioner does not only rely on state law in advancing his argument in this federal habeas petition.  Petitioner also argues that his due process rights were violated by the trial court's failure to instruct the jury on voluntary manslaughter.  To receive federal habeas relief for an error in jury instructions, Petitioner must show that the error so infected the entire trial that the resulting conviction

violates due process.  See Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  "Due process requires

that criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that

'criminal defendants be afforded a meaningful opportunity to present a complete defense.'"  Clark

v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S. 479, 485

(1984)).  Additionally, in order to obtain federal habeas relief on this claim, Petitioner "must

show that the alleged instructional error had substantial and injurious effect or influence in

determining the jury's verdict."  Byrd v. Lewis, 566 F.3d 855, 860 (9th Cir. 2009) (internal

quotation marks and citations omitted), cert. denied, – U.S. –, 120 S.Ct. 2103, 176 L.Ed.2d 733

(2010).  "A substantial and injurious effect means a reasonable probability that the jury would

have arrived at a different verdict had the instruction been given."  Id. (internal quotation marks

and citation omitted).  In determining whether petitioner was prejudiced by the failure to instruct

the jury on voluntary manslaughter, a court considers:  (1) the weight of the evidence that

contradicts the defense; and (2) whether the defense could have completely absolved the

defendant of the charge."  Id.  In this case, the burden on Petitioner is especially heavy where the

alleged error involves the failure to give an instruction.  See id.  An omission or an incomplete

instruction is less likely to be prejudicial than a misstatement of law.  See Henderson, 431 U.S. at

155; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

 In a non-capital case, such as this one, the "[f]ailure of a state court to instruct on a lesser

offense fails to present a federal constitutional question and will not be considered in a federal

habeas proceeding."  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  In Beck v.

Alabama, 447 U.S. 625, 638 (1980), the Supreme Court held that criminal defendants possess a

constitutional right to have the jury instructed on a lesser included offense in a capital case.

However, the Beck court expressly reserved the question of whether due process mandates the

application of the same right in non-capital cases.  See id. at 638 n. 14.  The right to have a jury

instructed on a lesser included offense is not clearly established federal law in a non-capital case

and consequently, the failure of a state trial court to instruct on a lesser included offense does not

present a federal constitutional question.  See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998).

In Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000), the Ninth Circuit stated that there may be an exception to this general rule for adequate jury instructions on a defendant's defense theory.  However, even if Petitioner does possess this right, Petitioner still would not be entitled to federal habeas relief on this argument.  He failed to show that any purported instructional error had a substantial and injurious effect on the jury's verdict.

Petitioner argues in his federal habeas petition that his voluntary manslaughter defense was "based on the facts that petitioner Pao's house had been shot at from the direction of Pra's gangs hangout on two difference occassion [sic]; the 9th and 10th of August 2004.  Plus, the fact Pra had pointed a gun at petitioner's cousin on two different occassion [sic] in one day."  (Pet'r's Pet. at p. 19.)

Under California law, murder is defined as "the unlawful killing of a human being . . . with malice aforethought."  Cal. Penal Code § 187(a).  Manslaughter is defined as "the unlawful killing of a human being without malice."  Id. at § 192.  In order to negate the malice element and reduce murder to voluntary manslaughter, the evidence needs to demonstrate that the killer acted upon a sudden quarrel or "heat of passion" aroused by a "provocation," see People v. Lasko, 23 Cal.4th 101, 108, 96 Cal.Rptr. 441, 999 P.2d 666 (2000), or that the defendant killed in the reasonable but good faith belief in having to act in self-defense.  See People v. Moye, 47 Cal.4th 537, 549, 98 Cal. Rptr.3d 113, 213 P.3d 652 (2009).

> The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or be conduct reasonably believed by the defendant to have been engaged in by the victim.  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.

People v. Lee, 20 Cal. 4th 47, 59, 82 Cal. Rptr. 2d 625, 971 P.2d 1001 (1999) (internal citations and quotation marks omitted).  If sufficient time elapsed between the provocation and the "fatal

blow," such that the defendant's passion subsided and rational thinking returned, the killing is not voluntary manslaughter.  See People v. Breverman, 19 Cal. 4th 142, 163, 77 Cal. Rptr. 2d 870, 960 P.2d 1094 (1998).

As the California Court of Appeal noted, the incident involving shots being fired into Petitioner's home in August 2004 was speculative.  Pra was not living in the apartment where the shots came from in August 2004.  Additionally, this incident took place six months prior to the killing in February 2005.  Thus, sufficient time had elapsed between the August 2004 incident and the shooting of Pra.  Furthermore, the incident involving Petitioner's cousin was even more remote as it occurred in June 2004, or eight months prior to the killing and did not even involve Petitioner.  Under these circumstances, Petitioner failed to show that the failure to give the voluntary manslaughter instruction had a substantial and injurious effect on the jury's verdict. The evidence for murder was strong and the evidence Petitioner cites in support of his voluntary manslaughter argument is weak.

Similar to his direct appeal, Petitioner argues that seeing Pra in February 2005 reignited his passion such that the failure to give the voluntary manslaughter instruction violated his due process rights.  This argument is unavailing.  By way of example only, the August 2004 incident was too speculative with respect to Pra's involvement such that there was nothing to "reignite." Second, the incident occurring in June 2004 did not even involve Petitioner.

Petitioner's citations to People v. Berry, 18 Cal. 3d 509, 134 Cal. Rptr. 415, 556 P.2d 777 (1976) and People v. Bridgehouse, 47 Cal. 2d 406, 303 P.2d 1018 (1956) are also unavailing under these circumstances.  In Berry, the defendant was taunted for two weeks by the victim (his wife) regarding the fact that his wife was in love with another man whom she had met in Israel only a few days after the two had been married.  See Berry, 18 Cal. 3d at 513-14, 134 Cal. Rptr. 415, 556 P.2d 777.  Ultimately, the California Supreme Court explained that the trial court erred in failing to instruct on voluntary manslaughter because, "Defendant's testimony chronicles a two-week period of provocatory conduct by his wife Rachel that could arouse a passion of

1   jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to

2   act rashly from this passion." Id. at 515, 134 Cal. Rptr. 415, 556 P.2d 777.  The circumstances of

3   Petitioner's case which purportedly involved the victim were far different.  Petitioner failed to

4   show that one incident even involved Pra and the other incident did not involve Petitioner but

5   was between Pra and Petitioner's relative.  Furthermore, both incidents occurred months before

6   the victim was fatally shot by Petitioner.  Under these circumstances, Berry is distinguishable.

7       Bridgehouse is also distinguishable for the reasons discussed by the California Court of

8   Appeal.  That case involved the defendant finding the man with whom his wife was having an

9   affair with at his mother-in-law's house and included evidence that the defendant was white and

10  shaking so as to give rise to voluntary manslaughter as opposed to murder.  See Bridgehouse, 47

11  Cal. 2d at 409, 303 P.2d 1018.

12      Within Claim I, Petitioner also argues that trial counsel was ineffective for failing to

13  follow up on his request for a voluntary manslaughter instruction.  The Sixth Amendment

14  guarantees effective assistance of counsel.  In Strickland v. Washington, 466 U.S. 668 (1984),

15  the Supreme Court articulated the test for demonstrating ineffective assistance of counsel.  First,

16  the petitioner must show that considering all the circumstances, counsel's performance fell below

17  an objective standard of reasonableness.  See id. at 688.  Petitioner must identify the acts or

18  omissions that are alleged not to have been the result of reasonable professional judgment.  See

19  id. at 690.  The federal court must then determine whether in light of all the circumstances, the

20  identified acts or omissions were outside the range of professional competent assistance.  See id.

21      Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

22  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

23  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

24  probability sufficient to undermine the confidence in the outcome."  Id.  A reviewing court "need

25  not determine whether counsel's performance was deficient before examining the prejudice

26  suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

1   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

2   followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

3   697).

4          Petitioner's trial counsel did in fact request a voluntary manslaughter instruction.  (See

5   Reporter's Tr. at p. 2343-46.)  Upon hearing argument from the parties regarding whether the

6   case warranted giving such an instruction, the trial court asked Petitioner's counsel if he had

7   anything further to add.  Petitioner's trial counsel had indicated to the trial court that he wanted

8   to do additional research on the matter and would email the court if he found anything further.

9   (See id. at p. 2344, 2346.)  The trial court then took the matter under submission.  (See id. at p.

10  2347.)  Petitioner argues that there is nothing in the record to indicate that this matter was ever

11  revisited thereby establishing ineffective assistance of counsel.

12         For similar reasons as stated above why Petitioner is not entitled to federal habeas relief

13  on his argument that the trial court erred in failing to give a voluntary manslaughter instruction,

14  Petitioner's ineffective assistance of counsel argument within this Claim also fails.  Petitioner

15  fails to show to a reasonable probability that the outcome of the proceeding would have been

16  different had counsel revisited the issue of the voluntary manslaughter instruction with the trial

17  court.  As previously outlined, the case against Petitioner for first-degree murder was strong and

18  his voluntary manslaughter defense was weak.

19         For the foregoing reasons, Petitioner failed to show that he is entitled to federal habeas

20  relief on Claim I.

21         B.  Claim II

22         In Claim II, Petitioner raises several arguments of prosecutorial misconduct.  He also

23  argues that trial counsel was ineffective for failing to object to the purported incidents of

24  prosecutorial misconduct.  The California Court of Appeal analyzed these arguments on direct

25  appeal and stated the following:

26         Pao cites five instances of what he alleges constituted prosecutorial

12

misconduct during the closing argument and rebuttal.  He claims the prosecutor (1) lied about the defense's trial options, (2) stated that Pao had a burden to prove his innocence, (3) denigrated defense counsel, (4) vouched for the strength of the prosecutor's case, and (5) acted as an unsworn witness.  Recognizing that he did not object to the alleged misconduct, Pao asserts that, to the extent an objection was needed, his trial counsel was ineffective for failing to object.  We conclude that, with one exception, Pao forfeited his claims of prosecutorial misconduct.  We further conclude Pao's trial counsel did not provide ineffective assistance of counsel because the prosecutor's statements during closing argument and rebuttal did not constitute misconduct.

A.  *Forfeiture and Asserted Effective Assistance of Counsel*

The Attorney General asserts that, with one exception, the contentions of prosecutorial misconduct were forfeited because Pao did not object to the prosecutor's comments when they were made.  [FN 4]  Pao responds that it was unnecessary to object and obtain an admonition to the jury because that would not have cured the harm.
[FN 4]  The one exception is noted below.

The California Supreme Court's analysis of the forfeiture issue in People v. Wharton (1991) 43 Cal.3d 522, at pages 566 and 567, is instructive:
"Defendant is precluded from raising this issue on appeal . . . because he failed to timely object and request the jury be admonished.  [Citations.]  Because none of the comments was so serious that a timely admonition would have been inadequate to cure the harm, any objection to the prosecutor's argument is deemed waived.  [Citations.]  [¶]  Defendant concedes trial counsel failed to object but presents two reasons why that fact is not controlling . . . . [¶] . . . [D]efendant would overcome application of the waiver rule by claiming his trial attorney provided ineffective assistance of counsel by failing to
object.  [Citations.]  Keeping in mind that 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [citation] we examine each instance of alleged misconduct."

B.  *Law Concerning Prosecutorial Misconduct*

Improper remarks by a prosecutor can "'so infect [ ] the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]"  (Darden v. Wainwright (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157].)  "'But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'''  [Citations.]"  (People v. Earp (1999)

13

20 Cal.4th 826, 858.)

C. *Alleged Instances of Prosecutorial Misconduct*

1. Comment about the Defense's Trial Options

Discussing the difference between trial counsel, who is an advocate, and the jury, which is the impartial judge, the prosecutor stated: "I can guarantee you, just as bold as this murder case was, just as red handed as this Defendant got caught, [Pao's defense counsel] will not get up here and say, My client did it.  That is not forthcoming."

Commenting on Pao's defense strategy, the prosecutor stated: "But the defenses available in this case are very limited because there is no way anybody can argue this isn't a cold and calculated first degree murder, could they?  There is no way.  Not the way this thing went down . . . . [¶] The defenses available were very limited.  He could only say it wasn't me.  All right.  And he needed one thing to pull that off, you need Lue Yang not to show up in this courtroom.  That was the only way you were going to get there.  Okay.  So all of the eggs got put in that basket." [FN 5] [FN 5]  Lue Yang, who is Pao's cousin and Yang's nephew, testified that Pao and [Chongt] Yang told him that they shot Pra.  In a recorded phone call from jail, Pao asked the person he called to contact Lue Yang and tell him not to come to court to testify.

Much later in the argument, the prosecutor returned to the subject of the defense strategy:  "You will probably never in your lifetime see another murder like you did here, and I hope to never see one again too.  This is as cold and calculated as it gets.  That is why the Defense from day one was stuck with only one option, it wasn't me."

Quoting these comments from the prosecutor's closing argument, Pao contends that the prosecutor lied to the jury about the options for the defense because the prosecutor knew that Pao had a provocation defense.  As we noted previously, however, the evidence was insufficient to support such a defense.  Therefore, the prosecutor's statement that Pao had no defense beyond his identity defense was not a lie.

2. Comment Concerning Pao's Burden to Prove Innocence

At the beginning of his rebuttal argument, the prosecutor stated:  "I think we need to be brutally honest about one thing, [Pao's defense counsel's] argument, while very eloquent, left us with this:  They can't prove it.  Right?  That is the point of his argument, isn't it? He didn't say, my guy wasn't in that car.  He didn't say, my guy was anywhere.  He said, they can't prove it.  [¶]  When I started my closing argument I told you that these three [*sic*] Defendants made

14

a concerted effort to make it as hard as they could for us to figure this out, didn't they?  And [Pao's defense counsel] got up here and said, you can't figure it out.  That is his point, isn't it?  We can figure it out."

Later during rebuttal argument, the prosecutor stated:  "Counsel did exactly what I thought he would do, he isolated every piece of evidence and analyzed it as though it existed in a vaccum, by itself, didn't he?  He didn't ask the one question that matters most, what are the chances that the man with the biggest motive in the world, who confessed to his uncle, and then called on the phone and tried to dissuade him from showing up, was urging to get to his family to take two years in prison not to be here, that's something you just can't overcome."

Pao contends that these statements may have been understood by the jury as requiring Pao to prove his innocence.  (People v. Woods (2006) 146 Cal.App.4th 106, 112 [improper for prosecutor to tell jury that defendant has burden to prove innocence].)  We disagree. In the first comment, the prosecutor was simply disagreeing with defense counsel's argument that the prosecution could not prove its case.  It was proper argument to note that the defense had not attempted to establish that Pao was not in the gold Toyota.  That was merely a comment on the state of the evidence and on defense counsel's argument.

In the second comment, the prosecutor properly argued that, despite the defense's attempt to have the jury view the evidence in isolation, viewing the evidence together established Pao's guilt. The statement about defense counsel not asking "the one question that matters most" was not an assertion that the defense was required to prove innocence; instead, it was a statement that the defense was attempting to have the jury not consider that question.

3.  Denigrating Defense Counsel

Pao contends that the prosecutor improperly denigrated the defense and his counsel.  He claims that comments made by the prosecutor during closing argument impugned counsel for wasting the jury's time and trying to deceive the jury and keep critical evidence from being introduced.  We conclude that the prosecutor did not commit misconduct.

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel."  (People v. Hill (1998) 17 Cal.4th 800, 832.)  "It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation].  Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence

15

and drawing reasonable inferences therefrom.  [Citations.]  [¶] Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.  [Citations.]  <u>People v. Bermore</u> (2002) 22 Cal.4th 809, 846.)  "Although the prosecution may not attack defense counsel's integrity, it may . . . vigorously attack the defense case and argument if that attack is based on the evidence.  (<u>People v. Hillhouse</u> (2002) 27 Cal.4th 469, 502.)  "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper."  (<u>People v. Cummings</u> (1993) 4 Cal.4th 1233, 1302, fn. 47.)  Similarly, "remarks [that] simply point [ ] out that attorneys are schooled in the art of persuasion . . . [do] not improperly imply that defense counsel [is] lying."  (<u>People v. Gionis</u> (1995) 9 Cal.4th 1196, 1216, fn. omitted.)

Pao asserts that 11 of the prosecutor's statements improperly impugned the defense and his counsel.  We quote those statements, though out of context, with the parts that Pao finds objectionable in italics:

- *"And in the effort to make our jobs a thousand times harder, with phone records and ATM reciepts*, we can get through it."  [FN 6]
  [FN 6]  The phone records and the ATM receipts showed that Pra made a deposit and a withdrawal from an ATM close to where he was killed just minutes before he was killed.  The evidence countered the testimony of Bou Vang that the gold Toyota had followed Pra in his red Honda on Highway 99 and Florin Road.

- "I want to talk about Lue Yang, all right.  Because *there was a very bold plan in this courtroom* to attack Bou Vang, to attack Boy Vang with lies that, well, that speak for themselves.  That ATM receipt.  No matters [*sic*] what I say about that, I honestly think that you folks figured that out before I did, right?  [¶]  If you think about it, they watching him at an ATM, right?  They did that.  But in order to make this plan work of the *surprise dramatic moment when the ATM receipt*, [Pao's defense counsel] said, was unsealed on Wednesday and put it all on the record, I want you to remember that moment, because *the only way that works is if Lue Yang doesn't show*."

- "In the Hmong culture that means a lot, and I will prove that really quickly with Lue Yang.  Get a hold of his relatives, tell him he can sit in jail for two years, it will go by in no time, because if Lue Yang shows up *the plan to attack Bou* is over, right?  It won't work.  Because Lue Yang knows who did the murder, okay.

16

- "And now I want to talk about Bou Vang. *This whole trial was set up with that concept Lue wouldn't show up* and Bou would be the only witness, right?

- "So we are thinking to ourselves, as [Yang's defense counsel] is mocking Bou Vang, right, were they talking to each other in the back seat *and the whole show that we had.*"

- "With two days of phone records what did it appear?  It appeared as though these two people weren't in the car together, right?  With a full two months of phone records and her denial on the stand, we know Cheng didn't have the phone, Eva did.  Okay.  *Their plan to slaughter Bou Vang,* who would know that – first off, who would know that this is even simpler?"  [FN 7]
[FN 7]  The phone records referred to in this paragraph are of a cell phone owned by Cheng, who was an occupant of the gold Toyota.  The records showed calls between Cheng's cell phone and Yang's cell phone, possibly contradicting testimony that both Cheng and Yang were in the gold Toyota at the time of the calls.  However, additional evidence showed that Cheng's cellphone was in the possession of Cheng's sister, Eva, at the time of the shootings.

- "From subpoenaing two days of phone records, oh, it looks really weird, right?  When you subpoena the whole packet and look at the whole thing in context, it's not weird at all, it's Eva's phone.  See, it takes brain grease to get there and we can get there.  All right.  *Kind of like those ATM records, right?*"

- "*At the bank when that testimony came out* everybody knew what it meant.  I didn't even have to say anything, did I?  In context *it wasn't about investigating a* case or –.  [¶]  [Defense objection overruled.]  [¶]  . . . *It wasn't about investigating a case.  It was much like [Yang's defense counsel's] two days of cell phone records, wasn't it?*  Think about it.  *It was done for presentation of evidence at trial, not about finding out what happened.*  You think that through.  *I don't even know if Counsel would comment on it in his closing.*  I now that [Yang's defense counsel] didn't want anything to do with it.  [¶]  [Defense objections concerning what Yang's defense counsel argued sustained.]  [¶]  . . . I think that the evidence shows exactly what this was about in this context, okay.  *What questions were asked, and in what order shows more than what, the date of its discovery and how it was used in this trial*, okay.  If you think it through, *it's just like*

17

*those phone records, okay."*

- *"*Um, I'm going to sit down here.  I only have one last thing I want to tell you.  Um, the phone records, which were clearly not the case.  Remember [*Yang's defense counsel's*] *field day with that?*  And the ATM receipt, which was sought to prove one thing and really proved another, didn't it?  Okay.  *Those kind of made your job harder* but in a way they kind of backfired, all right.  This was a very bold crime and they did it in such a fashion that it was almost unsolvable.  Their demeanor to the Sheriff's Department and their conduct was very bold, the three-way alibi.  All right.  And it almost made it unsolvable."

- "In this case this Defendant spoke to someone on the phone and urged that person not to come in here and testify, to go to prison for two years and not give you that piece of information.  *When that man can come in this courtroom, through his attorney and represent that he is not the shooter, that is amazing.*  You can never overcome that fact, that the one person that he confessed this shooting to is the one person he tried to dissuade from being here."

Citing these statements by the prosecutor, Pao asserts:  "There is a reasonable likelihood that the jury understood the prosecutor's remarks to mean that the defense attorneys had made the juror's service more time consuming and difficult by wasting its time on dramatic presentations that were an unwelcome and improper distraction from the search for the truth, that [Pao's] trial counsel had tried to deceive the jury by subpoenaing and introducing ATM records, and that the attorneys had conspired with their clients to keep Lue Vang [*sic*, read Lue Yang] from showing up in court and disrupting their plan to get an acquittal for their indisputably guilty clients."

We disagree with Pao's assessment of the prosecutor's remarks.  Reviewing courts have found remarks more egregious than the prosecutor's remarks in this case "not [to] exceed the bounds of permissible vigor."  (People v. Gionis, supra, 9 Cal.4th at pp. 1217-1218 ["'[Defense counsel's just doing his job'"; "'[h]is job is to . . . get him off]; People v. Breaux (1991) 1 Cal.4th 281, 305-306 [referring to defense argument, "[i]f you don't have [the law or the facts] on your side, try to create some sort of a confusion"]; People v. Goldberg (1984) 161 Cal.App.3d 170, 190 [defense counsel's "job" is to confuse the jury about the issues].)  In short, the challenged remarks of the prosecutor in this case were within the "wide latitude [allowed to counsel] in describing the deficiencies in opposing counsel's tactics and factual account"  (People v. Bemore, supra, 22 Cal.4th at p. 846.)  They did not constitute misconduct.

### 4.  Vouching for Strength of Prosecution Case

The prosecutor argued:  "You know there is a lot of evidence here.  Um, the sad part is you don't get to compare it to other cases but how frequently do you think it is – how rare it is to have the man with the perfect motive connected to the car who confessed to his uncle and then calls on the phone to dissuade him?  You know, it will never be enough.  It will never be enough."

Pao contends that this statement constituted improper vouching.  He asserts that the reference to other cases may have led the jurors to believe, based on the prosecutor's experience, that this case was supported by evidence stronger than the evidence presented in other case.  He also claims that it constituted improper vouching for the veracity of Lue Yang's statements inculpating Pao.

A prosecutor is said to vouch for the credibility of a witness when the prosecutor ""attempt[s] to bolster a witness by reference to facts outside the record.'"  [Citation.] Thus, it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.  [Citations.] . . . Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record.  [Citations.]"  (People v. Huggins (2006) 38 Ca.4th 175, 206-207; see also United States v. Weatherspoon (9th Cir. 2005) 410 F.3d 1142, 1146.)

Concerning the comparison to other cases, the prosecutor's comment did not refer to his own experience.  The comment did not imply that the jury should disregard its duty to convict simply because of how the evidence in this case compared to evidence in other cases.  The comment was merely an argument that the evidence against Pao was strong because it included his confession to Lue Yang.  To the extent that it implied a reference to other cases, it was so vague as to give the jury nothing to rely on with respect to those other case.

Furthermore, the comment concerning Lue Yang did not constitute vouching.  It was a statement based on the evidence in this case, that Lue Yang was related to Pao and that, after confessing to Lue Yang, Pao had attempted to dissuade him from testifying.

### 5.  Acting as Unsworn Witness

The prosecutor argued:  "Something that we may not have ever heard made it on the record, right.  It's about green and white.  Green and White.  There are two dialects in Hmong, the green and the white.  They are like dialects in English, are they not?  We have dialects in English.  We have southern, we have northern.  Mass media is quickly eliminating them.  [¶]  There was a point in time

when ignorant people, and that is a harsh word to use but it applies, would say things like, that southern drawl means that people are stupid.  There is a name for that in America, we call that hate.  Okay.  That's hate.  That's ugly.  [¶]  What did he say, Yer Yang?  I speak the white, it's clean and pure.  They speak green, it's vulgar.  That's hate.  You see, that motive was so thick and hard that he can never overcome that, no matters [*sic*] what he says.  That's the benefit of a long trial.  Things like that just squeeze their way out."

Pao contends that this statement constituted improper testimony on the part of the prosecutor because Yer Yang did not say that the white dialect is clean and pure and that the green dialect is vulgar.  (See People v. Hill, supra, 17 Cal.4th at p. 828 [improper for prosecutor to give unsworn testimony].)  This contention is without merit because the prosecutor was characterizing Yer Yang's testimony, not giving testimony of his own.

Yer Yang testified that "green is more like an attitude, you know, like a rough tone, and then the white is like, you know, clearer, you know."  The prosecutor's comment was a fair argument that what Yer Yang meant was that the green dialect is more vulgar compare to the clearer white dialect.

D.  *Conclusion*

We therefore conclude that, to the extend that Pao did not object, his assertions of prosecutorial misconduct are forfeited.  We further conclude that his trial counsel was not ineffective for failing to object because the cited comments by the prosecutor did not constitute misconduct.

Yang, 2009 WL 3069579, at *13-19.

        i.  Standard for Prosecutorial Misconduct

While the state court determined that Petitioner's prosecutorial misconduct arguments were forfeited, it still appeared to analyze each prosecutorial misconduct argument on the merits.  First, it set forth the relevant prosecutorial misconduct standard and then applied that standard to Petitioner's prosecutorial misconduct claims.  Thus, the merits of Petitioner's arguments within Claim II will be analyzed as well.[2]  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997)

---

[2] It is also worth noting that Respondent does not argue in his answer that Claim II is procedurally defaulted.  See Trest v. Cain, 522 U.S. 87, 89 (1997) (explaining that procedural default is not jurisdictional and can be waived).

20

1   (explaining that a district court may address the merits without reaching procedural issues where

2   the interests of judicial economy are best served by doing so); cf. Franklin v. Johnson, 290 F.3d

3   1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the

4   merits issues presented by the appeal, so it may well make sense in some instances to proceed to

5   the merits if the result will be the same.").

6          A criminal defendant's due process rights are violated if prosecutorial misconduct renders

7   a trial "fundamentally unfair." Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing

8   Darden v. Wainright, 477 U.S. 168, 183 (1986)). A habeas petition will be granted for

9   prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to

10  make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (internal

11  quotation marks and citation omitted). Isolated comments by a prosecutor may be cured by jury

12  instructions. See Sassounian v. Roe, 230 F.3d 1097, 1106-07 (9th Cir. 2000); see also Hall v.

13  Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were

14  isolated moments in a three day trial.") A claim of prosecutorial misconduct is analyzed under

15  the prejudice standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Karis v.

16  Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002) (stating that a claim of prosecutorial misconduct

17  is analyzed under the standard set forth in Brecht). Specifically, the inquiry is whether the

18  prosecutorial misconduct had a substantial and injurious effect on the jury's verdict. See

19  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial

20  misconduct because it could not have had a substantial impact on the verdict under Brecht).

21         With respect to improper prosecutorial comments during a closing argument, the law is

22  settled that under this due process standard, "[c]ounsel are given latitude in the presentation of

23  their closing arguments, and the courts must allow the prosecution to strike hard blows based on

24  the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246,

25  1253-54 (9th Cir. 1996) (internal quotation marks omitted). A reviewing court should consider a

26  prosecutor's allegedly improper statements in light of the realistic nature of trial closing

21

1  arguments.  "Because 'improvisation frequently results in syntax left imperfect and meaning less

2  than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous

3  remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation,

4  will draw that meaning from the plethora of less damaging interpretations.'"  Williams v. Borg,

5  139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647

6  (1974)).  A challenged or offering statement must also be evaluated in the context of the entire

7  trial, as well as the context in which it was made.  See Boyde v. California, 494 U.S. 370, 384-85

8  (1990).  Some factors to consider in determining the prejudicial effect of a prosecutor's

9  misconduct include:  (1) whether a curative instruction was issued, see Greer v. Miller, 483 U.S.

10  756, 766 n.8 (1987); (2) the weight of evidence of guilt, compare United States v. Young, 470

11  U.S. 1, 19 (1985) (finding "overwhelming evidence" of guilt), with United States v. Schuler, 813

12  F.2d 978, 982 (9th Cir. 1987) (requiring new trial after prosecutor referred to defendant's

13  courtroom demeanor, in light of prior hung jury and lack of curative instruction); (3) whether the

14  misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809

15  (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, see Giglio v.

16  United States, 405 U.S. 150, 154 (1972); and (5) whether the prosecutor's comment misstates or

17  manipulates the evidence.  See Darden, 477 U.S. at 181-82.

18              ii.  Prosecutor's Statement Regarding Options for Defense

19        Petitioner first argues that the prosecutor improperly informed the jury during closing

20  arguments that the only defense Petitioner had was an identity defense.  Petitioner argues that this

21  misapplied the evidence in light of Petitioner's voluntary manslaughter defense.  Petitioner

22  argues that the following statement by the prosecutor amounted to misconduct:

23              Now, this is first degree murder.  The law says that the law does
             not seek to measure in units of time what it takes to ripen an intent
24              level into first degree murder because a cold and calculated
             judgment can be reached like that (snapped fingers).  You will
25              probably never in your lifetime see another murder like you did
             here, and I hope to never see one agin too.  This is as cold and
26              calculated as it gets.  This is why the Defense from day one was

                                          22

1        stuck with only one option, it wasn't me.  All right.

2  (Reporter's Tr. at p. 2530.)

3       Petitioner fails to show that he is entitled to federal habeas relief on this prosecutorial

4  argument.  The case against Petitioner for first-degree murder in this case was strong.  By way of

5  example only, it included the eyewitness testimony of Bou Vang.  She testified that the

6  defendants (which included Petitioner), talked about "jumping" the victim once they saw him in

7  his red Honda.  (See id. at p. 1561.)  Additionally, Bou Vang testified she saw Petitioner exit the

8  vehicle they were in with a gun and then saw the shooting at the victim's vehicle.  (See id. at p.

9  1570-74.)  Furthermore, Petitioner confessed to shooting the victim to Lue Yang.  (See id. at p.

10  921-22.)  Petitioner also tried to get Lue Vang not to testify against him at trial.  (See id. at p.

11  2097.)   Based on the foregoing evidence in the record, the case against Petitioner was strong

12  such that any purported error would be deemed harmless.

13       Furthermore, as outlined in supra Part V.A, Petitioner's voluntary manslaughter defense

14  was weak such that it did not amount to a violation of his due process rights by not having the

15  jury instructed on that defense.  The trial judge specifically instructed the jury that the attorney's

16  statements were not evidence.  The jury was instructed that, "[n]othing the attorneys say is

17  evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but

18  their remarks are not evidence.  Their questions are not evidence.  Only the witness's answers are

19  evidence." (Id. at p. 2594.)  The jury is deemed to have followed these instructions.  See Weeks

20  v. Angelone, 528 U.S. 225, 234 (2000).  Thus, Petitioner failed to show that the statement had a

21  substantial and injurious effect on the jury's verdict.

22       Under these circumstances, Petitioner is not entitled to federal habeas relief on this

23  argument.  He fails to show that the prosecutor's statement had a substantial and injurious effect

24  on the jury's verdict.

25          iii.  Prosecutor's Statements on Burden of Proof

26       Next, Petitioner argues that the prosecutor's closing argument and rebuttal improperly

shifted the burden of proof from the prosecutor to Petitioner.  In support of this argument,

Petitioner cites to several statements that the prosecutor made to the jury.  Petitioner objects to

the following statement made by the prosecutor, "[i]t [referring to phone and ATM records]

wasn't about investigating a case.  It was much like Mr. Bowman's two days of cell phone

records, wasn't it?  Think about it.  It was done for presentation of evidence at trial, not about

finding out what happened.  You think that through." (Reporter's Tr. at p. 2520.)  Petitioner

argues that this statement amounted to the prosecutor stating that the Petitioner had the burden to

show what actually happened.  Petitioner also objects to the following statements made by the

prosecutor during his rebuttal:

> But I think we need to be brutally honest about one thing, Mr.
> Choyce's argument, while very eloquent, left us with this:  They
> can't prove it.  Right?  That is the point of his argument, isn't it?
> He didn't say, my guy wasn't in the car.  He didn't say, my guy
> was anywhere.  He said, they can't prove it.
>
> When I started my closing argument I told you that these three
> Defendants made a concerted effort to make it as hard as they
> could for us to figure this out, you can't figure it out.  That is his
> point, isn't it?  We can figure it out.

(Reporter's Tr. at p. 2583.)  Finally, Petitioner objects to the following statement by the

prosecutor made during rebuttal:

> Counsel did exactly what I thought he would do, he isolated every
> piece of evidence and analyzed it as though it existed in a vacuum,
> by itself, didn't he?  He didn't ask the one question that matters
> most, what are the chances that the man with the biggest motive in
> the world, who confessed to his uncle, and then called on the
> phone and tried to dissuade him from showing up, was urging to
> get to his family to take two years in prison not to be here, that's
> something you just can't overcome.

(Reporter's Tr. at p. 2588.)

     During closing arguments, a prosecutor is allowed reasonably wide latitude and can freely

argue reasonable inferences from the evidence.  See United States v. Gray, 876 F.2d 1411, 1417

(9th Cir. 1995); United States v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984).  Furthermore, they

1   are allowed to strike hard blows based upon the testimony and its inferences, although they may

2   not employ argument which could be fairly be characterized as foul or unfair.  See United States

3   v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972) (per curiam).

4          The first comment by the prosecutor was merely responding to the phone records and

5   ATM evidence by placing that evidence into context.  In considering claims of prosecutorial

6   misconduct, allegations of improper argument must be examined in the context in which they

7   were made.  See Turner v. Calderon, 281 F.3d 851, 868 (9th Cir. 2002) (examining statements in

8   the context in which they were made).  The prosecutor's first comment did not attempt to shift

9   the burden of proof from the prosecutor to the Petitioner, rather it was putting the phone and

10  ATM record evidence into context.

11         Additionally, the prosecutor's rebuttal statements quoted above also did not amount to

12  prosecutorial misconduct.  The first rebuttal comment quoted was made in response to the

13  argument that the prosecution failed to prove its case.  It did not shift the burden of proof to the

14  Petitioner.  Furthermore, as noted by the California Court of Appeal, the second rebuttal

15  statement quoted attempted to bring the jury back to the issue of considering the entire evidence

16  in the case rather than viewing the evidence in isolation.  This statement also did not shift the

17  burden of proof from the prosecution to Petitioner.

18         Finally, it is worth noting that the jury was instructed that Petitioner is presumed innocent

19  and that that presumption requires that the People prove that Petitioner is guilty beyond a

20  reasonable doubt.  (See Reporter's Tr. at p. 2593.)  Thus, the jury was specifically instructed as to

21  the correct burden of proof.  The jury is deemed to have followed this instruction.  See Weeks,

22  528 U.S. at 234.  Thus, in light of the fact that the prosecutor's statements to the jury did not

23  attempt to shift the burden of proof to the Petitioner and the trial judge's specific accurate

24  instructions on the prosecutor's burden of proof, Petitioner is not entitled to federal habeas relief

25  on this prosecutorial misconduct argument.

26  //

iv.  Prosecutor Denigrating Defense Counsel

Petitioner also argues that the prosecutor committed misconduct by denigrating defense counsel several times during his closing arguments.  Petitioner relies on several statements made by the prosecutor to support this argument (as cited by the California Court of Appeal).  The purported misconduct from these statements falls into two categories.  First, Petitioner argues that the prosecutor impermissibly stated to the jury that defense counsel was needlessly making the jury's job longer and more difficult by presenting ATM and phone records.  Second, Petitioner argues that defense counsel was part of a plan to keep Lue Yang from testifying.  (See Pet'r's Pet. at p. 26.)

A prosecutor may not gratuitously attack defense counsel's integrity and veracity.  See, e.g., Bruno v. Rushen, 721 F.2d 1193, 1194-95 (9th Cir. 1983) (per curiam).  However, a prosecutor can fairly rebut defense counsel's contentions.  See United States v. Bagley, 772 F.2d 482, 494-95 (9th Cir. 1985).

The prosecutor's statements concerning the phone and ATM records did not amount to prosecutorial misconduct by denigrating defense counsel.  Instead, the prosecutor's statements related to this specific evidence, not to defense counsel.  Furthermore, the prosecutor comments regarding Lue Vang were in response to evidence already in the record concerning attempts by Petitioner to prevent Lue Vang from testifying.  The prosecutor was merely putting this evidence into context and/or was responding to the evidence already in the record to present his best case to the jury.  It does not amount to prosecutorial misconduct.  As noted above, the prosecutor is allowed to strike "hard blows" based upon the testimony and its inferences.

Furthermore, even if the prosecutor's statements were improper, Petitioner still would not be entitled to federal habeas relief because it did not have a substantial and injurious effect on the jury's verdict.  The jury was instructed that counsel's statements were not evidence.  Additionally, the case against Petitioner was strong in that it included an eyewitness, Bou Vang, as well as the testimony of Lue Vang who testified that Petitioner implicated himself in the

26

1   crime.  Thus, this argument does not merit federal habeas relief.

2                       iv.  Prosecutor Vouching for Strength of His Case

3          In his fourth prosecutorial misconduct argument, Petitioner argues that the prosecutor

4   impermissibly vouched for the strength of his case during closing arguments.  Specifically,

5   Petitioner objects to the following argument made by the prosecutor:

6                  You know there is a lot of evidence here.  Um, the sad part is you
                   don't get to compare it to other cases but how frequently do you
7                  think it is – how rare it is to have the man with the perfect motive
                   connected to the car who confessed to his uncle and then call on
8                  the phone and dissuade him?  You know, it will never be enough.
                   It will never be enough. . . .
9
                   It doesn't get any better than this:  You confessed to being the
10                 shooter to your uncle and then you dissuade him.  If there was any
                   doubt in the voracity of that confession, he sealed it by calling,
11                 right?  He did, didn't he?  If there was any doubt as to whether Lue
                   Yang was telling the truth, you sealed it when you called him.  You
12                 told us in no uncertain terms that was the truth.

13  (Reporter's Tr. at p. 2588-89.)

14         As recently explained by the Ninth Circuit:

15                 "The rule that a prosecutor may not express his personal opinion of
                   the defendant's guilt or his belief in the credibility of witnesses is
16                 firmly established."  United States v. McKoy, 771 F.2d 1207,
                   1210-11 (9th Cir. 1985); see also United States v. Kerr, 981 F.2d
17                 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling
                   the jury his individual impressions of the evidence.").  "Improper
18                 vouching occurs when the prosecutor places the prestige of the
                   government behind the witness by providing personal assurances
19                 of the witness's veracity."  Id. (brackets and internal quotation
                   marks omitted).  Improper vouching also occurs where the
20                 prosecutor suggests that the testimony of government witnesses is
                   supported by information outside that presented to the jury.  United
21                 States v. Younger, 398 F.3d 1179, 1190 (9th Cir. 2005).  "We have
                   also identified improper vouching and related misconduct in a
22                 broader range of circumstances.  A prosecutor may not, for
                   instance, express an opinion of the defendant's guilty, denigrate the
23                 defense as a sham, implicitly vouch for a witness's credibility, or
                   vouch for his or her own credibility."  United States v. Hermanek,
24                 289 F.3d 1076, 1098 (9th Cir. 2002) (internal citations omitted).
                   However, "vouching typically involves the prosecution bolstering
25                 the testimony of its *own* witness."  United States v. Nobari, 574
                   F.3d 1065, 1078 (9th Cir. 2009).

26

United States v. Wright, 625 F.3d 583, 610 (9th Cir. 2010) (emphasis in original).

With respect to the prosecutor's comment about Lue Vang, it did not amount to vouching for the credibility of that witness. Rather, it sought to place Lue Vang's testimony into context for the jury to remind the jury that Lue Vang was related to Petitioner and that Petitioner confessed to him and attempted to dissuade Lue Vang from testifying. Thus, the prosecutor's statement about Lue Vang cited above was not vouching and did not amount to misconduct.

Petitioner also argues that the prosecutor improperly compared this case to other cases by implying that the case against him was stronger than other cases. Assuming *arguendo* that Petitioner's interpretation of the prosecutor's statement during closing arguments is correct, Petitioner still would not be entitled to federal habeas relief because any purported misconduct would be deemed harmless under these circumstances. The statement did not have a substantial and injurious effect on the jury's verdict. See Fry v. Pliler, 551 U.S. 112, 120 (2007) (stating that the Ninth Circuit was correct in applying the Brecht standard of review in assessing the prejudicial impact of a federal constitutional error in a state court criminal trial). First, the jury was specifically instructed that the statements of counsel are not evidence and the jury is deemed to have followed that instruction. See Weeks, 528 U.S. at 234. Second, the case against Petitioner in this case was strong. It included eyewitness testimony through Bou Vang who identified Petitioner as one of the culprits of the shooting. Additionally, the evidence included the inculpatory statements made by Petitioner to Lue Vang after the crime was committed as well as Petitioner's attempt to dissuade Lue Vang from testifying at trial. For the foregoing reasons, Petitioner is not entitled to federal habeas relief on this prosecutorial misconduct argument.

v. Prosecutor Acting as an Unsworn Witness

Petitioner also argues that the prosecutor committed misconduct by acting as an unsworn witness. Petitioner argues that two statements made by the prosecutor during closing arguments amounted to prosecutorial misconduct. First, Petitioner takes exception to the prosecutor's statement that Petitioner and his co-defendant were "sent" from Marysville to Sacramento. (See

28

1   Reporter's Tr. at p. 3483 ("Until what, low and behold part of the three-way alibi is Ge Lor Pao

2   and Chongt Yang, two Marysville residents recently sent here.").)  In the state court proceedings,

3   the Attorney General admitted that "there was no testimony that appellant and his co-defendant

4   were sent from Marysville to Sacramento by anyone."  (See Resp't's Lodged Doc. 4 at p. 22.)

5          The California Court of Appeal did not analyze this statement in its September 28, 2009

6   opinion.  However, Petitioner also raised this argument in his petition for review to the California

7   Supreme Court.  (See Resp't's Lodged Doc. 7 at p. 33-34.)  The California Supreme Court issued

8   a summary denial which is considered a decision on the merits.  Harrington v. Richter, 131 S.Ct.

9   770, 784 (2011).  Therefore, the record will be independently reviewed to determine whether the

10  California Supreme Court's denial of this Claim was an unreasonable application of clearly

11  established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

12         Petitioner failed to show that the prosecutor's statement had a substantial and injurious

13  effect on the jury's verdict.  As previously noted, the jury was specifically instructed that the

14  attorneys' statements were not evidence and the jury is presumed to have followed those

15  instructions.  See Weeks, 528 U.S. at 234.  Furthermore, the evidence in this case was strong

16  against Petitioner.  It included eyewitness testimony as well as Petitioner's inculpatory statements

17  that he made to Lue Vang after the shooting occurred.  Thus, Petitioner is not entitled to federal

18  habeas relief on this argument.

19         Petitioner also asserts that the prosecutor mischaracterized Yer Yang's testimony, thereby

20  acting as an unsworn witness.  During the trial, Yer Yang testified that there are two dialects in

21  Hmong, green and white.  Yer Yang stated that the different dialects mean, "[i]t's just – just like,

22  um, different tone of word that they use but with a, um – with more like – I don't know.  Like

23  green is more attitude, you know, like a rough tone, you know, and then the white is like, you

24  know, clearer, you know."  (Reporter's Tr. at p. 1470.)  The prosecutor stated that Yer Yang

25  stated that, "I speak the white, it's clean and pure.  They speak the green, it's vulgar.  That's

26  hate."  (Id. at p. 2487.)

1    Petitioner is not entitled to federal habeas relief on this argument as well.  As previously

2    indicated, a prosecutor is permitted to make inferences based on the evidence produced at trial.

3    The prosecutor's statement was merely inferring what Yer Yang was implying through his

4    testimony regarding the differences between the green and white dialects of Hmong.

5    Additionally, Petitioner failed to show that the comment had a substantial and injurious effect on

6    the jury's verdict.  The jury was specifically instructed that the attorney's comments are not

7    evidence and the case against Petitioner in this case was strong in that it included eyewitness

8    testimony and Petitioner's own inculpatory statements he made to Lue Vang.

9                        vi.  Cumulative Effect

10    Petitioner also argues that the cumulative effect of the prosecutor's misconduct warrants

11    granting him federal habeas relief.  The combined effect of multiple trial errors may give rise to a

12    due process violation if the trial was rendered fundamentally unfair, even where each error

13    considered individually would not require reversal.  See Parle v. Runnels, 505 F.3d 922, 927 (9th

14    Cir. 2007).  The fundamental question in determining whether the combined effect of trial errors

15    violated a defendant's due process rights is whether the errors rendered the criminal defense "far

16    less persuasive" thereby having a "substantial and injurious effect or influence" on the jury's

17    verdict.  See id. at 927 (quoting Brecht, 507 U.S. at 637).  Cumulative error is more likely to be

18    found prejudicial when the government's case is weak.  See United States v. Frederick, 78 F.3d

19    1370, 1381 (9th Cir. 1996).

20    In this case, the evidence against Petitioner was strong.  It included eyewitness testimony

21    through Bou Vang.  Additionally, the evidence at trial included Petitioner's own inculpatory

22    statements to Lue Vang which further strengthened the prosecution's case.  Thus, the record

23    reflects that the cumulative effect of any prosecutorial misconduct that may have occurred in this

24    case did not result in Petitioner receiving an unfair trial.  Petitioner is not entitled to federal

25    habeas relief on this cumulative error argument.

26    //

vii.  Ineffective Assistance of Counsel

To the extent that Petitioner also argues that counsel was ineffective for failing to object to the various statements by the prosecutor outlined within this section, Petitioner is not entitled to federal habeas relief.  As outlined supra, the statements did not constitute prosecutorial misconduct and/or Petitioner failed to show that they had a substantial and injurious effect on the jury's verdict.  Therefore, for similar reasons, Petitioner failed to show that counsel's performance fell below an objective standard of reasonableness for failing to object to the prosecutor's statements that did not constitute misconduct and/or failed to show to a reasonable probability that the outcome of the proceeding would have been different had trial counsel made such objections in light of the fact that any purported error was harmless.

For the foregoing reasons, Petitioner is not entitled to federal habeas relief on any of his arguments within Claim II.

D.  Claim III

In Claim III, Petitioner argues that the trial court erred when evidence that Bou Vang had seen Petitioner in possession of a gun was admitted.  The California Court of Appeal analyzed this Claim as follows:

> Pao contends that the admission of a statement by Bou Vang that she had seen Pao in possession of a firearm two years before the killing violated his due process and fair trial rights.  We conclude that, even assuming a constitutional violation, the admission of the evidence was not prejudicial.
>
> In a motion in limine, Pao asked the trial court to exclude, pursuant to Evidence Code section 1101, any mention that Pao's girlfriend, Bou Vang, had seen Pao in possession of a firearm before the events culminating in the killing of Pra.  The trial court ordered that no mention of such an event be made during the trial unless the court ordered otherwise.  During trial, counsel for Yang played a tape of a police interview of Bou Vang on the day of Pra's killing.  In response to a question concerning Pao and firearms, Bou Vang stated during the interview that Pao did not carry a gun but that she had seen him with a gun two years earlier.  The trial court concluded that mention of the gun in the interview violated the in limine order; however, the court determined that the evidence was relevant and admissible.  The court did not state why

31

1    it was relevant.

2        On appeal, Pao asserts that changing the in limine order violated
         his rights to due process and fair trial.  Based on his constitutional
3        argument, Pao argues that we must apply the <u>Chapman</u> standard for
         harmless error, requiring reversal unless the error is harmless
4        beyond a reasonable doubt.  (<u>Chapman v. California</u> (1967) 386
         U.S. 18 [17 L.Ed.2d 705].)  The Attorney General responds that the
5        constitutional issue was forfeited because, in the trial court, Pao
         did not object to admission of the evidence based on the
6        Constitution.  The Attorney General further asserts that it was not
         error for the trial court to reverse its ruling concerning the
7        evidence, although the Attorney General does not explain why the
         evidence was relevant.  Pao replies to the forfeiture argument by
8        referencing <u>People v. Partida</u> (2005) 37 Cal.4th 428, which held
         that failure to raise a constitutional issue in the trial court does not
9        forfeit the issue if it appears that (1) the appellate claim is the kind
         that required no trial court action to preserve it or (2) the
10       constitutional argument does not invoke facts or legal standards
         different from those the trial court was asked to apply.  (<u>Id.</u> at pp.
11       435-436.)

12       We need not consider the merit of Pao's argument that admission
         of the evidence violated his due process and fair trial rights or the
13       Attorney General's argument that the constitutional issue was
         forfeited because, even assuming the admission of evidence
14       concerning Pao's prior possession of a firearm violated Pao's
         rights to due process and a fair trial, any such error was harmless
15       beyond a reasonable doubt.  The evidence of Pao's firearm
         possession was remote – two years before the killing – and was
16       unconnected to the firearm possession in this case and Bou Vang's
         reference to Pao's prior, one-time possession of a firearm was
17       brief.  Furthermore, the evidence of Pao's guilt was overwhelming,
         supported by his statement to Lue Yang about his involvement and
18       the eyewitness testimony of Bou Vang that Pao was one of the two
         assailants.  Therefore, there was no prejudice.  [FN 8]
19       [FN 8]  Given this conclusion, we also need not consider Pao's
         assertion that, if a more specific objection was necessary to
20       preserve the constitutional issue, his trial counsel was ineffective
         for failing to make the objection.

21

22   <u>Yang</u>, 2009 WL 3069579, at *19-20.

23       "A habeas petitioner bears a heavy burdern in showing a due process violation based on

24   an evidentiary decision."  <u>Boyde v. Brown</u>, 404 F.3d 1159, 1172 (9th Cir. 2005), <u>amended on</u>

25   <u>reh'g by</u>, 421 F.3d 1154 (9th Cir. 2005).  The admission of evidence violates due process only if

26   there are no permissible inferences the jury may draw from it.  <u>See</u> <u>id.</u>  Even where a trial court

1   errs in admitting the evidence at issue, such error is deemed harmless unless it had a substantial

2   and injurious effect or influence in determining the fact finder's verdict.  See Gill v. Ayers, 342

3   F.3d 911, 921 (9th Cir. 2003) (citing Brecht, 507 U.S. at 637); see also Fry, 551 U.S. at 121-22

4   (holding that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional

5   error in a state court criminal trial under the 'substantial and injurious effect' standard set forth in

6   Brecht . . . whether or not the state appellate court recognized the error and reviewed it for

7   harmlessness under the 'harmless beyond a reasonable doubt standard set forth in Chapman.")

8         Even assuming *arguendo* that the trial court erred in allowing evidence to be included in

9   the record that Bou Vang saw Petitioner with a gun two years prior, such error was harmless

10   under the relevant Brecht standard.  As noted by the California Court of Appeal, the evidence in

11   this case against Petitioner was strong.  It included eyewitness testimony from Bou Vang as well

12   as Petitioner's statements to Lue Yang in which he implicated himself in the shooting.  Under

13   these circumstances, Petitioner is not entitled to federal habeas relief on this Claim.

14      E.  Claim IV

15         In Claim IV, Petitioner argues that his additional sentence of twenty-five years to life for

16   the enhancement under Cal. Penal Code § 12022.53(d)[3] for using a firearm which caused death

17   violated the double jeopardy clause.  The California Court of Appeal analyzed this Claim as

18   follows:

19                Pao contends that the trial court violated double jeopardy
                  principles by imposing both 25-years-to-life terms; one for first

20               degree murder and one for the firearm enhancement pursuant to
                  Penal Code section 12022.5, subdivision (d)(1), which provides for

21               an additional 25-years-to-life term when the defendant personally
                  discharges a firearm causing death.  He claims that imposing both

22               terms violates double jeopardy because it punishes him twice for

23

24       [3] Cal. Penal Code § 12022.53(d) states that, "[n]otwithstanding any other provision of
   law, any persn who, in the commission of a felony specified in subdivision (a), Section 246, or

25   subdivision (c) or (d) of Section 12034, personally and intentionally discharges a firearm and
   proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person

26   other than an accomplice, shall be punished by an additional and consecutive term of
   imprisonment in the state prison for 25 years to life.

1    causing Pra's death.

2    Pao recognized that this contention has been rejected by the California Supreme Court.  <u>People v. Izaguirre</u> (2007) 42 Cal.4th
3    126, 130-131; <u>People v. Sloan</u> (2007) 42 Cal.4th 110, 115-123; <u>People v. Palacios</u> (2007) 41 Cal.4th 720, 725.)  He also recognizes
4    that we are bound by those decisions.  (<u>Auto Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455.)  Accordingly, we
5    conclude the double jeopardy contention is without merit.

6    <u>Yang</u>, 2009 WL 3069579, at *20.

7        The Double Jeopardy Clause contains three distinct constitutional protections.  <u>See</u>

8   <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1204 (9th Cir. 2006).  "It protects against a second

9   prosecution for the same offense after acquittal.  It protects against a second prosecution for the

10   same offense after acquittal.  It protects against a second prosecution for the same offense after

11   conviction.  And it protects against multiple punishment for the same offense."  <u>North Carolina</u>

12   <u>v. Pearce</u>, 395 U.S. 711, 717 (1969) (footnotes omitted); <u>see also</u> <u>Brown v. Ohio</u>, 432 U.S. 161,

13   165 (1977).

14        In <u>Plascencia</u>, 467 F.3d at 1204, the Ninth Circuit analyzed whether a petitioner's

15   sentence for murder in addition to a twenty-five years to life enhancement for using a firearm

16   constituted double jeopardy.  The Ninth Circuit explained that the United States Supreme Court

17   in <u>Missouri v. Hunter</u>, 459 U.S. 359, 366 (1983):

18    made clear that the protection against multiple punishments for the same offense did not necessarily preclude cumulative punishments
19    in a single prosecution.  The key to determining whether multiple charges and punishments violate double jeopardy is legislative
20    intent.  When the legislature intends to impose multiple punishments, double jeopardy is not invoked.

21

22   <u>Plascencia</u>, 467 F.3d at 1204.  The Ninth Circuit continued by stating that the language of §

23   12022.53 is clear and that there is no question that the California legislature "simply determined

24   that a criminal offender may receive additional punishment for any single crime committed with

25   a firearm."  <u>Id.</u>  In <u>Plascencia</u>, the Ninth Circuit rejected a similar double jeopardy argument that

26   Petitioner raises in this case.  <u>See id.</u>  Accordingly, Petitioner is not entitled to federal habeas

1    relief on this Claim.

2                          VI.  PETITIONER'S REQUESTS

3         A.  Appoint Counsel

4         Petitioner requests the appointment of counsel.  There currently exists no absolute right to

5    the appointment of counsel in habeas proceedings.  See, e.g., Nevius v. Sumner, 105 F.3d 453,

6    460 (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any

7    stage of the case "if the interests of justice so require."  In the present case, the interests of justice

8    do not so require to warrant the appointment of counsel.  Accordingly, Petitioner's request for the

9    appointment of counsel is denied.

10        B.  Evidentiary Hearing

11        Petitioner also requests an evidentiary hearing on his Claims.  A court presented with a

12   request for an evidentiary hearing must first determine whether a factual basis exists in the record

13   to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."

14   Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d

15   1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate

16   that he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).

17   To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if

18   true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal

19   quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for

20   the reasons stated in supra Part V.  Petitioner failed to demonstrate that he has a colorable claim

21   for federal habeas relief.  Moreover, the Supreme Court has recently held that federal habeas

22   review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that

23   adjudicated the claim on the merits" and "that evidence introduced in federal court has no

24   bearing on" such review.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his

25   request will be denied.

26   //

                                          35

VII.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.      Petitioner's request for the appointment of counsel is DENIED; and

2.      Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS RECOMMENDED that the amended petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  September 8, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

36